UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MAURICE FRANKEL, et al.,

            Plaintiffs,

v.

THE DETROIT MEDICAL
CENTER, et al.,

            Defendants.

_____/

CIVIL ACTION NO. 05-40249

DISTRICT JUDGE PAUL V. GADOLA

MAGISTRATE JUDGE DONALD A. SCHEER

## REPORT AND RECOMMENDATION

**I.    RECOMMENDATION**:

I recommend that Defendants' Motion for Summary Judgment be granted, except as to the claims of Plaintiff Young against Defendant DMC Healthcare Centers, Inc. under the Founding Fathers Agreement.

**II.    REPORT**:

    **A.    Procedural History**

Plaintiffs original Complaint was filed on August 4, 2005. Defendants filed their Answer on August 25, 2005. On the following day, the court entered an Order of Partial Dismissal without prejudice, retaining jurisdiction only as to Plaintiffs' federal claims.

An Amended Complaint was filed on November 4, 2005, and a Second Amended Complaint was filed on November 16, 2005. Defendants filed their Answer and Affirmative Defenses to the Amended Complaint on November 21, 2005. Following a period of discovery, Defendants filed their Motion for Summary Judgment on May 18, 2006. Plaintiffs filed their Response, under seal, on June 30, 2006.

On July 19, 2006, Defendants filed a Motion to Strike Untimely Declarations as to Richard Small, Raymond Weitzman, Maurice Frankel and Henry Kaine. Defendants filed a Response the Motion to Strike on August 3, 2006.

On December 27, 2006, the pending motions were referred to the undersigned magistrate judge. The motions were brought on for hearing on February 1, 2007, and taken under advisement.

### B. Applicable Law and Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue of material fact regarding the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial. Celotex Corp. V. Catrett, 477 U.S. 317, 322 (1986); Martin v. Ohio Turnpike Comm'n, 968 F.2d 606, 608 (6th Cir. 1992).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences in a light most favorable to the nonmoving party. 60 Ivy St. Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir. 1987). The court is not required or permitted, however, to judge the evidence or make findings of fact. Id. at 1435-36. The moving party has the burden of showing conclusively that no genuine issue of material fact exists. Id. At 1435.

A fact is "material" for purposes of summary judgment if proof of that fact would have the effect of establishing or refuting an essential element of the cause of action or a defense advanced by the parties. Kendall v. Hoover Co., 751 F.2d 171, 174 (6th Cir. 1984). A dispute over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Accordingly, when a reasonable jury could not find that the nonmoving party is entitled to a verdict, there is no genuine issue for trial and summary judgment is appropriate. Id.; Feliciano v. City of Cleveland, 988 F.2d 649, 654 (6th Cir. 1993).

Once the moving party carries the initial burden of demonstrating that there are no genuine issues of material fact in dispute, the burden shifts to the nonmoving party to present specific facts to prove that there is a genuine issue for trial. Anderson, 477 U.S. at 256. To create a genuine issue of material fact, the nonmoving party must present more than just some evidence of a disputed issue. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). As the United States Supreme Court has stated, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmoving party's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted); see Celotex, 477 U.S. at 322-23; Matsushita, 475 U.S. at 586-87.

Consequently, the nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. Lucas v. Leaseway Multi Transp. Serv., Inc., 738 F.Supp. 214, 217 (E.D. Mich. 1990) (Gadola, J.), aff'd 929 F.2d 701 (6th Cir. 1991).

"The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find the plaintiff." Anderson, 477 U.S. at 252; see Cox v. Ky. Dep't of Transp., 53 F.3d 146, 150 (6th Cir. 1995).

### C.    Factual History

The majority of the Plaintiffs are physicians[1] who formerly owned the Woodland Medical Group, P.C. ("Group"), which operated multi-specialty medical clinics located in Detroit and Novi ("Woodland Clinics").  Group was a successor to the Woodland Medical Group, Inc. ("Old Woodland") which was founded by a small cadre of physicians in the l960s.  Dr. Irving Young, deceased, was one of the founders of the enterprise.  The Second Amended Complaint[2] alleges that Dr. Young and other founders entered into a deferred compensation agreement with Group "prior to 1991."  (Complaint, Paragraph 7).  That agreement ("Founding Fathers Agreement" or "FFA") provided for the payment of $70,000.00 to Dr. Young upon his retirement.  (Complaint, Exhibit B).  In 1986, The Detroit Medical Center ("DMC") acquired the capital stock of Group (Plaintiffs' Exhibit 2, Stock Purchase Agreement ).  Shortly thereafter, Plaintiffs formed a new entity named Woodland Physicians, P.C. ("PC"), through which they continued to provide medical services at the Woodland Clinics under a medical services agreement ("MSA").  In 1987, the Plaintiffs

---

[1] Two Plaintiffs, Bina Young and Andrew Kochanowski, are each the legal representative of a deceased physician.  Ms. Young represents the interests of her late husband, Dr. Irving Young, and Mr. Kochanowski represents the interest of Dr. Kristina Kochanowska, deceased.  For convenience, both doctors and representatives will be collectively described as "Plaintiffs" unless individually named.

[2] The Second Amended Complaint will hereinafter be referred to simply as the "Complaint."

4

and/or their predecessors in interest entered into deferred compensation agreements ("DCAs") with PC.  (Plaintiffs' Exhibit 4, Tab A is an example).

On December 31, 1991, Old Woodland, DMC Health Care Centers, Inc., DMC Centers, Inc. ("Centers") and PC entered into an agreement terminating the medical services agreement ("Medical Services Agreement Termination Agreement" or "MSATA"). In 1992, Plaintiffs became employees of Centers, and continued to work at the Woodland Clinics for their new employer.  In 1993, Centers implemented a new deferred compensation plan known as the DMC Centers, Inc. Woodland Deferred Compensation Plan ("Centers-Woodland Plan").  In March 2003, the Woodland Clinics were closed and the Plaintiffs were laid off.  All deferred compensation benefits were thereupon terminated.

The Complaint alleges that DMC ceased making payments to Plaintiffs in 2003, without good cause and despite the fact that Plaintiffs honored all of their respective obligations to DMC.  (Complaint, Paragraphs 16 and 17).  They seek a judgment compelling specific performance as to the past due compensation benefits (Count I) and a declaratory judgment confirming their rights to receive deferred compensation (Count II) and ordering Defendants to pay "to each Plaintiff any and all amounts due and owing, past, present and future, . . . plus interest, costs and attorneys fees.

### D.    Analysis

This case presents a dispute over the terms of a series of written agreements. Under Michigan law, the paramount goal when interpreting a contract is to give effect to the intent of the contracting parties.  Old Kent Bank v. Sobczak, 243 Mich.App. 57, 63-64 (2000).  The court is to read the agreement as a whole and attempt to apply the plain language of the contract itself.  Id.  If the intent is clear from the language of the contract

itself, there is no place for further construction or interpretation of the agreement. <u>Farm Bureau Mutual Insurance Co. v. Nikkel</u>, 460 Mich. 558, 566 (1999). A contract provision that is clear and unambiguous must be "taken and understood in [its] plain, ordinary, and popular sense." <u>Mich. Mutual Insurance Co. v. Dowell</u>, 204 Mich.App. 81 (1994). Unambiguous contract provisions are not subject to interpretation and must be enforced as written. <u>Id</u>. "The intention must be gathered, not from what a party now says he then thought but from the contract itself." <u>County of Cass v. Lee</u>, 271 Mich. 491, 494-95 (1935).

If a term is not defined in a contract, it is to be interpreted in accordance with its commonly used meaning. <u>Henderson v. State Farm Fire and Casualty Co.</u>, 460 Mich. 348, 354 (1999). Clear and unambiguous language may not be rewritten under the guise of interpretation. <u>South Macomb Disposal Authority v. American Insurance Co.</u>, (on remand), 225 Mich.App. 635, 653 (1997). Courts may not create ambiguities where none exist. <u>Id</u>. Contract language is ambiguous when, after reading the entire document, its language can reasonably be understood in different ways. <u>Royce v. Citizens Insurance Co.</u>, 219 Mich.App. 65, 70 (1996). "However, if a contract, even an inartfully worded or clumsily arranged contract, fairly admits of but one interpretation, it may not be said to be ambiguous or fatally unclear." <u>Michigan Township Participating Plan v. Pavolich</u>, 232 Mich.App. 378, 382 (1998). Likewise, a contract is not rendered ambiguous by the fact that a relevant term is not defined. <u>Henderson</u>, <u>supra</u> at 354.

The initial determination of whether contract language is ambiguous is a question of law for the court to decide. <u>Rainbow Nails Enterprises, Inc. v. Maybelline, Inc.</u>, 93 F.Supp. 2nd 808, 820 (E.D. Mich. 2000) (citing <u>Port Huron Education Association MEA/NEA v. Port Huron Area School District</u>, 452 Mich. 309, 323 (1996). Once the court determines

6

that the contract is ambiguous, it is subject to further construction or interpretation. "It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury." <u>Klapp v. United Insurance Group Agency, Inc.</u>, 468 Mich. 459, 469 (2003). "In resolving such a question of fact, i.e., the interpretation of a contract whose language is ambiguous, the jury is to consider relevant extrinsic evidence." <u>Id</u>. "Looking at the relevant extrinsic evidence to aid in the interpretation of a contract whose language is ambiguous does not violate the parole evidence rule." <u>Id</u>. at 470. Parole evidence bars language which adds to or detracts from the writing, but not evidence which merely ascertains the meaning of what the parties intended. <u>Id</u>. Ambiguity in a contract is resolved against the party who prepared it. <u>Lichnovsky v. Ziebart International Corp.</u>, 414 Mich. 558, 566 (1999).

In an action claiming benefits under an ERISA plan, the plan documents control. <u>Lake v. Metropolitan Life Insurance Company</u>, 73 F.3d 1372, 1379 (6th Cir. 1996) ("federal law gives effect to straight forward language in ERISA - governed plans"). Courts will not artificially create ambiguity where none exists. If a reasonable interpretation favors one party, "and any other interpretation would be strained, no compulsion exists to torture or twist the language of the [plan]." <u>Evans v. Safeco Life Insurance Co.</u>, 916 F.2d 1437, 1441 (9th Cir. 1990). In ERISA cases, as in other contract disputes, the plan documents must be construed as a whole. <u>Walmart Health Plan v. Millard</u>, 393 F.3d 1119, 1123 (10th Cir. 2004); <u>Sprague v. General Motors</u>, 92 F.3d 1425, 1439 (6th Cir. 1996).

### 1.    Plaintiff Bina Young's Claim Based on Founding Fathers Agreement

Plaintiff Bina Young, as successor in interest to Dr. Irving Young, claims entitlement to deferred compensation benefits allegedly owing to Dr. Young under the Founding Fathers Agreement.  She maintains that DMC assumed responsibility for the payment of those benefits under the terms of the MSATA.

Defendants maintain that neither DMC nor any of its affiliates assumed liability for the payment of benefits provided under the Founding Fathers Agreement.  Defendants further maintain that, because Ms. Young has been unable to produce the underlying contract which was amended by the Founding Fathers Agreement, her claim should be dismissed.  Finally, Defendants maintain that any valid claim by Plaintiff Young would lie only against Defendant DMC Healthcare Centers, Inc., the DMC affiliate into which Woodland Medical Group was ultimately liquidated.

Defendants' argument that Ms. Young's failure to produce her late husband's original 1972 employment contract precludes relief under the terms of the FFA is unpersuasive. Young seeks to enforce deferred compensation benefits provided in Paragraph 3 of the FFA.  That paragraph provides that the benefits provisions set out within it were deemed by the parties to be added to Dr. Young's original employment contract "as if originally set forth therein."  Thus, I am satisfied that the deferred compensation provisions may be analyzed and enforced by this court even in the absence of a complete copy of the 1972 agreement.  The pertinent provisions of the 1972 agreement are before the court, in writing and signed by appropriate representatives of Group.  I conclude that the FFA may be independently enforced against Group, or any other person/entity who may have assumed

the liabilities of that corporation. Defendants admit that Group was ultimately liquidated into DMC Healthcare Centers, Inc. On that basis, I conclude that general issues of material fact remain as to the extent to which such liquidations may impose liability on the surviving corporation.

Plaintiff Young is correct in her assertion that the FFA does not provide for the termination of Dr. Irving Young's deferred compensation benefits upon the closure of the Woodland Clinics. Enforcement of those provisions against these Defendants, however, requires a showing that one or more of them assumed the contractual obligations of Group under the FFA. DMC purchased the Group stock in 1986. (Defendants' Exhibit 2-Stock Purchase Agreement). Young maintains that, in doing so, DMC "assumed the Woodland Medical Group's liabilities . . ." including the liability of paying Dr. Young's deferred compensation under the FFA. Unfortunately, she cites no language in the 1986 stock purchase agreement which supports her claim. To be sure, Section 7.8(b) of the stock purchase contract expressly preserves Dr. Young's "compensation and fringe benefits" under his employment agreement with "the Company," as amended, and provides that such entitlements "shall be paid by the Company" upon termination of his employment. DMC's obligation in connection with such benefits is set out in the last sentence of the same paragraph, as follows: "DMC shall cause the Company to ratify and affirm the Company's obligation to each of the old shareholders under Section 6 of his employment agreement with the Company, as amended." The plain language of the contract, therefore, imposes the obligation to pay Dr. Young's benefits upon "the Company." The initial paragraph of the stock purchase agreement provides that "the Company" is Woodland Medical Group, P.C. Simply put, nothing in the Complaint or in Plaintiff's brief in response

9

to the Motion for Summary Judgment offers any basis for this court to depart from the observance of corporate form and pass the contractual obligations of Group on to any other person or entity based solely upon the provisions of the 1986 stock purchase agreement.

Plaintiff relies upon correspondence to Dr. Young from David J. Weiner, DMC's retirement programs manager, as evidence that DMC assumed the financial obligation of Group under the FFA. Specifically, she relies upon a letter of February 3, 1998 which makes reference to Young's entitlement to a $70,000.00 deferred compensation benefit. (Plaintiffs' Exhibit 9C). That letter clearly states, however, that such benefit was "due from the Woodland P.C." and makes no assertion that such obligation was assumed by DMC. Similarly, Weiner wrote to Dr. Young in response to a threat by his lawyer to file suit over the $70,000.00 obligation. (Plaintiffs' Exhibit 2B). That letter cites several enclosures, including an agreement which "moves the remaining deferred compensation due from the Woodland P.C. (presumably Group) to DMC Centers, Inc." Page 2 of the letter provides that "[t]he $70,000.00 Founding Fathers deferred compensation benefit is paid in 11 installments . . .," which were not deemed to be subject to advance taxation. Plaintiff has offered no evidence, however, that the enclosed "agreement" was ever executed by Dr. Young or anyone on behalf of the Defendants. In the absence of evidence establishing the specific terms of the alleged agreement and its execution by the parties sought to be bound, I am satisfied that no reasonable fact finder could conclude that Plaintiff is entitled to a judgment against any entity other than Group.[3]

---

[3] Plaintiff did submit an "agreement" dated May 6, 1999, between Harold Wasserman and Detroit Medical Center which contains a paragraph relating to benefits to which Wasserman was entitled under the Founding Fathers Plan. (Plaintiffs' Exhibit 8). Wasserman is not a party to this action, and his contract is simply insufficient to

Finally, Plaintiff Young urges this court to find that the MSATA recognizes the existence of an obligation on the part of DMC to pay Dr. Young's benefits under the FFA. She cites Paragraph 6(a) of the MSATA which provides that "Centers" (DMC Centers, Inc.), shall pay to "PC" (Woodland Physicians, P.C.) funds to be used by PC to meet its deferred compensation obligations to those persons who as of the date of the agreement (December 31, 1991) were receiving deferred compensation benefits from PC in accordance with written agreements. The paragraph further provided that a list of all such persons was contained in Exhibit 5 to the MSATA. That exhibit, entitled "Woodland Physicians, P.C. Persons Currently Receiving Deferred Compensation" listed three doctors. Dr. Irving Young was not one of them.

Section 6(b) of the MSATA provides that "Centers" would make payments to "PC" in amounts sufficient to permit PC to pay deferred compensation. That subparagraph, however, relates to deferred compensation agreements which "provided that upon completion of 15 or more years of employment by P.C. and satisfaction of other criteria," the obligation would be paid. That characteristic applies to the 1987 deferred compensation agreements, but not to the deferred compensation benefits set out in the FFA.

In footnote 14 of her brief, Plaintiff Young makes reference to internal DMC communications in which Mr. Weiner makes reference to five physicians who were entitled to all or a portion of the $70,000.00 deferred compensation benefit. Tab 2 of the document identifies Dr. Young as entitled to payment. Such evidence may be considered by this

_____

establish a similar relationship between Dr. Young and DMC.

court, however, only in the event that the contract provisions relating to Dr. Young's entitlement to benefits are ambiguous. In the absence of ambiguity, the contract provisions themselves must control. Those provisions must be afforded their plain and ordinary meaning, despite later declarations by the parties as to the existence of a contrary intent.

## 2. Claims Based Upon Pre-1991 Deferred Compensation Agreements

The Complaint alleges that, prior to 1991, each individual Plaintiff executed a deferred compensation agreement ("DCA") with PC. Attached to the Complaint as Exhibit A is a copy of the March 13, 1987 DCA between PC and Plaintiff Edward Malinowski, M.D. Plaintiffs represent that Exhibit A is representative of the contracts that each of them executed. Plaintiffs further allege that, by entering into the Medical Services Agreement Termination Agreement ("MSATA"), on or about December 31, 1991, DMC assumed the obligation to pay deferred compensation benefits to which Plaintiffs were entitled under their respective DCAs. (Complaint, Paragraph 8). The Complaint alleges that the MSATA was a "new deferred compensation agreement plan . . . to replace the [pre 1991 agreement with PC], and that it "called for periodic payment to each shareholder upon retirement dependent <u>only</u> on a calculated number of years of service to PC . . .." (emphasis added) (Complaint, Paragraph 9). A copy of the MSATA is attached to the Complaint as Exhibit C.

Plaintiffs maintain that DMC's promise to them was "clear, definite, and unequivocal and was specifically made to induce Plaintiffs to pay . . . consideration and forego their own respective deferred compensation agreements with PC." (Complaint, Paragraph 23). Plaintiffs allege further that, in 1999 and 2000, DMC induced various Plaintiffs to "prepay

12

the entire tax obligation of the deferred compensation obligation, and in so doing, affirmed DMC's obligation to pay the entire amount of deferred compensation for which the tax had been paid." (Id.). The Complaint asserts that, "[t]o the extent that the prior assumed deferred obligations provided any legitimate means for DMC to cease making payments to Plaintiffs, the tax elections in 1999 and 2000 modified any prior agreement and imposed an unequivocal obligation on DMC to satisfy the entirety of the deferred compensation agreements." Thus, Plaintiffs claim that DMC is estopped from ceasing to make payments under either deferred compensation obligation. (Id.).

Defendants maintain that the MSATA was not a free standing deferred compensation benefits plan, but rather a "link" between the 1987 DCA's and the Centers-Woodland plan. Under the Defendants' view, the "plan documents" for purposes of ERISA are the DCA's and the Centers-Woodland plan, each of which provide for termination of benefits upon closure of the Woodland Clinics. (Defendants' Brief, pages 14-16).

Accepting the Plaintiffs' assertion that the terms of their respective pre-1991 (i.e. 1987) deferred compensation agreements were identical to the language contained in Exhibit A to the Complaint, there is no doubt that the DCA's expressly provided for the cessation of benefits upon the termination of the medical services agreement and the subsequent closure of the Woodland Medical Clinics. (See Complaint, Exhibit A, Paragraph 2(c)). The central issue for determination, then, is whether or not the MSATA created a free standing substitute deferred compensation plan which omits the benefits cessation provision.

The "recitals" section of the MSATA expressly declares the desire of Woodland Medical Group, Inc. ("Group")[4] and Woodland Physicians, P.C. ("PC") to terminate the medical services agreement. The recitals further declare PC's desire, in connection with the termination of the MSA "to delegate its duties with respect to certain employment agreements between PC and its physician employees, as well as the desire of DMC Health Care Centers, Inc. ("Centers") "to undertake the obligations of PC under the employment agreements." Paragraph 1 ("Termination") of the MSATA declares the termination of the medical services agreement. Paragraph 3(b) provides that "each physician employee who is a party to a deferred compensation agreement (as defined in paragraph 6.b below) with Woodland Physicians, P.C. or its predecessors will receive from Centers with respect to his or her employment by Centers the benefits also described in Exhibit 2."

Exhibit 2 of the MSATA bears the heading "DMC Centers, Inc. Explanation of Employee Benefits for Physicians Previously Employed by Woodland Physicians, P.C." The First paragraph of the exhibit declares that:

> The purpose of this notice is to explain to you in general terms the benefits which will be provided to you upon becoming employed by DMC Centers, Inc. This explanation is only a short summary of these benefits. The specific provisions of most of these benefits are described in their plan documents, which are available for your review upon request.

(MSATA, Exhibit 2). On page 4 of the exhibit is a section bearing the heading "Substitute for existing non-qualified deferred compensation program." The initial paragraph of that section discusses both "[t]he existing non-qualified deferred compensation arrangement

---

[4] Woodland Medical Group, P.C. is designated "Group" in this report, but is designated as "Woodland" in the MSATA.

14

maintained by Woodland Physicians, P.C.," and "[a]dditional accruals for years of service after becoming employed by DMC Centers, Inc." The discussion of the "existing" arrangement explains that it "provides a retirement benefit equal to $5,000.00 multiplied by [the physician's] years of service. The exhibit further explains that the benefits are paid over a ten year period after retirement, death or disability. The document states that the program must be restricted because of Internal Revenue Code limits, but that "[b]enefits that have already been accrued will be paid by the P.C. <u>when due</u>." (Emphasis added). Plaintiffs maintain that this language in Exhibit 2 creates an unqualified right to benefits over a ten year period, regardless of whether or not the Woodland Clinics remained open. They base this claim on the fact that the termination upon closure provision of the 1987 DCAs is not expressly incorporated into Exhibit 2. I find the argument unpersuasive. Exhibit 2 explicitly states at the outset that it is merely a "short summary" and that specific provisions of benefits are described in their respective plan documents. The portion of the initial paragraph on page 4, in referring to the existing (1987 DCA) deferred compensation program, does provide that benefits already accrued will be paid "when due." When due under what criteria? The criteria set out in the 1987 DCAs is the only reasonable answer. Plaintiffs offer no alternative criteria. To read the provisions of Exhibit 2 otherwise imposes a strained and illogical interpretation. Only the 1987 agreements can provide the criteria which establish the circumstances under which benefits they created are "due." A reading of the balance of the first paragraph of Exhibit 2 supports that view. It provides for additional accruals of benefits "for years of service after becoming employed by DMC Centers, Inc." It states that benefits would be provided by Centers "if you work until at least age 59½ with DMC Centers, Inc. . . ., have at least 15 years of combined service with [PC

15

and Centers] prior to such time, <u>and would otherwise be eligible under the current arrangement</u> to receive such benefits at that time." I am satisfied that Exhibit B, fairly read, incorporates in full the benefits provisions of the 1987 DCAs, and that no reasonable finder of fact could conclude otherwise.

Reading all of the pertinent documents together, I am persuaded that the MSATA is not a separate, free standing deferred compensation plan, but simply an agreement by Centers to provide PC with sufficient funds to meet its obligation to Plaintiffs under the 1987 DCAs, and to provide Plaintiffs with deferred compensation benefits for future service under the same eligibility requirements as the "current arrangement" (1987 DCAs), except for the time in service changes specifically stated. Under the 1987 plan, no plaintiff would be eligible for benefits subsequent to the closure of the Woodland Clinics. No language in the MSATA serves to alter that limitation, and it should not be assumed that the parties intended such a result in the absence of a clear expression to that effect.

The body of the MSATA also supports this reading. Paragraph 6(b) permitted doctors covered by the 1987 DCAs with PC to combine their pre-1992 years of service to PC and its predecessors with their 1992 and subsequent years of service to Centers for purposes of meeting the 15 years of service minimum required for benefits. If at least 15 years of service could be thus established, a physician would be "entitled to deferred payments from PC, but only to the extent of his or her employment by PC or its predecessors. The contract further provided that: [i]n such event PC shall make the deferred payments <u>in accordance with the terms of the deferred compensation agreement</u> [1987 DCA] with regard to his or her years of service as an employee of PC or its predecessors (as opposed to as an employee of Centers), and Centers shall make

payments to PC in amounts sufficient to permit PC to pay such deferred payments.  I agree with Defendants' interpretation of this language as an undertaking by Centers to provide funds with which PC could make payments to Plaintiffs in accordance with the terms of the 1987 DCAs.  I find nothing in the language of the MSATA to suggest that DMC or any of its Defendant affiliates intended to assume any greater obligation than PC had undertaken in the DCAs, or to forego any limit or exception to PC's duty to pay benefits under those agreement.

### 3.  Claims Under the DMC Center's Inc. Woodland Deferred Compensation Plan

The Complaint alleges that each of the Plaintiffs entered into a new deferred compensation agreement plan with DMC on or about January 1, 1992.  Plaintiffs allege that the new plan "called for periodic payments to each shareholder upon retirement dependent only on a calculated number of years of service to PC prior to DMC's stock purchase agreement."  A copy of this new plan, entitled "DMC Centers, Inc. Woodland Deferred Compensation Plan ("Centers-Woodland") is attached to the Complaint, and is attached to Plaintiffs' Brief as Exhibit 6.[5]

Plaintiffs maintain that the Centers-Woodland Plan is unenforceable because DMC was obliged by the terms of the MSATA to draft the Centers-Woodland Deferred Compensation Benefits Plan without payment limitations.  Under the Plaintiffs' theory, there is no provision in the MSATA for non-payment of "accrued" benefits due to the closure of clinics or the 1% revenue limitation.  I simply disagree.  Exhibit 2 to the MSATA provided,

---

[5]  Plaintiffs' Brief refers to the Centers-Woodlands Plan as the "NDCA" or New Deferred Compensation Agreement.  For purposes of continuity, I will refer to it in this Report as the Centers-Woodland Plan.

in pertinent part, that additional accruals for years of service after becoming employed by DMC would be provided by DMC Centers, Inc.: (a) If an employee physician worked until age 59½ with DMC Centers, Inc.; (b) had at least 15 years of combined service with PC and DMC Centers, Inc. prior to such time; and (c) "would otherwise be eligible under the current arrangement to receive such benefits at that time." (MSATA Exhibit 2, Paragraph 1). (Emphasis added). In my view, use of the term "the current arrangement" is an unmistakable reference to the provisions of the 1987 DCAs, each of which expressly provided for the limitation/termination of benefits in the event of substantial revenue declines or the closure of the Woodland Clinics. Plaintiff offers no alternative explanation of the words "current arrangement," and general rules of contract construction require the court to give meaning to all of the language employed.

Based upon their view that the MSATA was an undertaking by DMC to pay benefits attributable to employment by DMC Centers, Inc. without the benefits limitations/termination provisions, Plaintiffs argue that the Centers-Woodland Plan containing such provisions breached DMCs contractual promise to abandon them. They urge the court to find that the termination provisions of the Woodland-Centers Plan are unenforceable because it is a unilateral contract under which Plaintiffs' acceptance (by the performance of their work as employees) closed the door to retroactive amendment by DMC. They cite Kemmerer v. ICI Americas, Inc., 70 F.3d 281 (3rd Cir. 1995) and In re New Valley Corporation, 89 F.3d 143 (3rd Cit. 1996) for the proposition that, even where a plan reserves to the sponsor an explicit right to terminate the plan, acceptance by performance closes the door on that right under unilateral contract principles. While Plaintiffs' general statement of the holdings is correct, each decision allowed for an exception where "an explicit right to terminate . . . after the

participants' performance is reserved." Kemmerer, 70 F.3d at 287-88; New Valley, 89 F.3d at 151 (citing Kemmerer). In the instant case, the 1987 DCAs explicitly reserved to PC the right to reduce or terminate benefits to Plaintiffs under specified conditions even after their retirements, and after the actual payment of benefits had begun. (Complaint, Exhibit A, Paragraphs 2(b), 2(c)). As stated above, I find no evidence to support Plaintiffs' allegation that the MSATA eliminated the limitation/termination provisions of the deferred compensation agreements, or obligated DMC to eliminate them from the Centers-Woodland Plan. I am satisfied that the right of termination explicitly set out in the 1987 DCAs was incorporated into the terms of the MSATA and that such conclusion necessarily follows from the plain and ordinary meaning of the words employed. I do not find that the terms of the agreement are ambiguous, and I am simply unable to accept Plaintiffs' assertion that a genuine issue of material fact remains on that issue.

### 4. Estoppel

Plaintiffs allege that, at various times during 1999 and 2000, they entered into an agreement with DMC which reaffirmed the latter's complete obligation to pay deferred compensation "by having certain Plaintiffs prepay the tax obligation of the entire deferred compensation amount due each of them from DMC, based on the clear and unequivocal representation that by prepaying, DMC was committed to honor the entirety of the deferred compensation agreement it assumed from PC. (Complaint, Paragraph 10). The "clear and unequivocal representation" allegedly took the form of various correspondence from Defendants' benefits manager, Mr. Weiner, which referred to Plaintiffs' deferred compensation benefit as "vested." Plaintiffs claim that those references signified that their rights to future payments could not be diminished or terminated. The Complaint asserts

that "the tax elections in 1999 and 2000 modified any prior agreement and imposed an unequivocal obligation on DMC to satisfy the entirety of the deferred compensation agreements," and that the Defendants are therefore estopped from ceasing to make payments under either deferred compensation plan.

Defendants counter that both the 1992 Centers-Woodland deferred compensation plan and the 1987 DCAs, contained specific language: (a) limiting DMC's obligation to pay deferred compensation in any fiscal year to a total expenditure not to exceed 1% of the total revenues of the Woodland Clinics for that year; and (b) providing that, upon the closure of the Woodland Clinics, the company's obligation to pay any benefits would terminate and no further benefits would be due or owing to any participant. (1987 DCAs, pages 2-3, Paragraph 2(b), 2(c); Center-Woodlands Plan, page 3) "Payment of Benefit"). Defendants argue that the plan documents are unambiguous. They maintain that Plaintiffs' estoppel argument is insufficient as a matter of law because: (1) estoppel will not operate to vary unambiguous plan documents; and (2) even if estoppel was available as an argument, the evidence in this case does not support the existence of all essential elements of the doctrine.

The linchpin of Plaintiffs' entire case is their claim that the MSATA imposed upon Defendant Centers the "obligations" undertaken by PC to Plaintiffs in the 1987 DCAs, but minus the explicit limitations on those obligations as set out in the original agreements. For the reasons already explained above, I find no evidence to support Plaintiffs' position, and conclude that the unambiguous terms of the MSATA imposed upon Centers the same obligations undertaken by PC in 1987, subject to the same limitations, exceptions or qualifications to which Plaintiffs originally agreed. Accordingly, I conclude that the

20

limitation/termination provisions apply identically in the 1987 DCAs, the MSATA and the Centers-Woodlands Deferred Compensation Agreements. Thus, those Plaintiffs who opted into the Centers-Woodlands Plan suffered no detriment solely by reason of the benefits termination clause in that contract. The question remains, however, whether Mr. Weiner's use of the term "vested" in various forms in his written communications should be held to be plan amendments which estop Defendants from terminating Plaintiffs' deferred compensation benefit payments under any of the plans.

Defendants assert that the correspondence in which Mr. Weiner used the term "vested" (and variants) related to the treatment of Plaintiffs Deferred Compensation Benefits under the Internal Revenue Code. Plaintiffs were offered the chance to "move years of service from the 1987 DCAs to the Centers-Woodland Plan, so as to assist the physicians in paying tax on deferred income attributed to them." (Defendants' Reply Brief, page 4) (see also Exhibit 6, Paragraph 17-18). In schedules appended to the correspondence, Weiner often used the word "vest" in quotation marks. Defendants argue that he did so as a shorthand indication that the Plaintiffs "met the basic plan qualification criteria (age, years of service)." (Defendants' Reply Brief, page 4, citing Weiner Deposition, Plaintiffs' Exhibit 4, 7, 9 and 12). They maintain that Weiner's communications to Plaintiffs contained no material representation which could form the basis for an estoppel. Weiner, they claim, merely offered an opportunity to transfer years of service from the old plan to the Centers-Woodland Plan as a benefit to Plaintiffs and with no intent or prospect of financial benefit to Defendants. Defendants emphasized that Weiner in no way represented that election of the option would negate the termination provisions in the 1987 DCAs or the Centers-Woodland Plan. They point out that, when asked to prepare a letter

for Plaintiffs' attorney to issue as an aid in making their elections, Weiner wrote quite explicitly that closure of the Woodland Clinics would result in termination of deferred compensation benefits under both the old and new plans. (Defendants' Exhibit 6, Attachment H).

Based upon my review of the Exhibits, I conclude that Defendants' position is correct. The correspondence relating to the option addresses only the tax treatment of Plaintiffs' deferred compensation. Based upon the plain meaning of the language in the Deferred Compensation Plans, I have concluded that the limitation/termination provision was included in each of them. Thus, a discussion of those provisions was not germane to correspondence clearly intended to address only tax consequences, and their absence does not support a reasonable inference that Defendants intended to waive the right to terminate benefits if the clinics were closed. Although Weiner's correspondence did contain estimates of benefits to be paid in future years, those calculations simply fail to support Plaintiffs' characterization of them as a commitment to pay all future benefits in spite of reduced revenues and/or clinic closure. Viewed in context, Weiner's calculations of future benefits were mere projections for the purpose of anticipating tax liabilities. The letters neither increased nor decreased Plaintiffs' entitlement to deferred compensation. I am satisfied that no reasonable fact finder could determine otherwise.

In Sprague v. General Motors Corp., 133 F.3d 388, 402 (6th Cir. 1998) the Court observed that Congress intended that plan documents and summary plan descriptions should exclusively govern an employer's obligations under ERISA plans.

> For us to sanction informal "plans" or plan "amendments" - whether oral or written - would leave the law of employee benefits in a state of uncertainty and would create disincentives for employers to offer benefits in the first place. Such a result

> is not in the interests of employees generally, and it is certainly
> not compatible with the goals of ERISA. Cf. <u>Moore</u>, 856 F.2d
> at 489: "Altering a welfare plan on the basis of non-plan
> documents and communications, absent a particularized
> showing of conduct tantamount to fraud, would undermine
> ERISA."

<u>Id</u>., at 403. In the same case, the court declared that "principles of estoppel . . . cannot be

applied to vary the terms of unambiguous plan documents; estoppel can only be invoked

in the context of ambiguous plan provisions." In support of that proposition, the court

reasoned that estoppel requires reasonable or justifiable reliance by the party asserting the

doctrine. That party's reliance can rarely, if ever, be reasonable if it is inconsistent with

clear and unambiguous terms of plan documents available to or furnished to the party.

Furthermore, to allow estoppel to override the clear terms of plan documents would be to

enforce "something other than the plan documents themselves." <u>Id</u>. at 404. Even if the

doctrine of estoppel could be invoked in this instance, I am persuaded that the Plaintiffs

who elected to opt into the Centers-Woodland Plan are unable to demonstrate the element

of justifiable reliance on Defendants' representation resulting in their detriment. As stated

above, both the old and the new deferred compensation plans provided for

limitation/termination of benefits based upon the earnings/closure of the Woodland Clinics.

Any Plaintiff who overpaid his tax obligation by reason of the early recognition of income

by the IRS can file for a refund of taxes paid on anticipated benefits which were never

received.

## 5. <u>Conclusion</u>

Both parties argue that evidence extrinsic to the plan documents in this case will

support their respective positions. The court, however, may look to extrinsic evidence only

if the plan under consideration is ambiguous. <u>International Union v. Yard-Man, Inc.</u>, 716

F.2d 1476, 1480-82 (6th Cir. 1983). As stated above, I am satisfied that the plan documents in this case are not ambiguous. Viewed as a whole, the documents reflect an intent, at every stage of their evolution, that the obligation to pay Plaintiffs' deferred compensation benefits would terminate upon closure of the Woodland Clinic operations. While the draftsmanship of the MSATA may be subject to criticism, I am satisfied that the language employed could not be reasonably accepted as the manifestation of an intent to alter or abandon the termination provisions contained in the 1987 DCAs. Both the 1987 agreements and the Centers-Woodland Plan expressly condition the obligation to pay deferred compensation benefits on the continued operation of the clinics. While Plaintiffs may have offered a "scintilla" of evidence to support their claims in their Complaint, I conclude that they have failed to produce evidence on which a fact finder could reasonably hold in their favor. Accordingly, I recommend that Defendants' Motion for Summary Judgment be granted, as to all claims other than that of Defendant Young against DMC Healthcare Centers, Inc.

## III.  NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. Section 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. United States v. Walters, 638 F.2d 947 (6th Cir. 1981), Thomas v. Arn, 474 U.S. 140 (1985), Howard v. Secretary of HHS, 932 F.2d 505 (6th Cir. 1991). Filing of objections that raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. Smith v. Detroit Federation of Teachers Local 231,

24

829 F.2d 1370, 1373 (6th Cir. 1987), <u>Willis v. Secretary of HHS</u>, 931 F.2d 390, 401 (6th Cir. 1991).  Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response.  The response shall not be more than five (5) pages in length unless by motion and order such page limit is extended by the Court.  The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/Donald A. Scheer
DONALD A. SCHEER
UNITED STATES MAGISTRATE JUDGE

DATED: June 29, 2007

_____

**CERTIFICATE OF SERVICE**

I hereby certify on June 29, 2007 that I electronically filed the foregoing paper with the Clerk of the Court sending notification of such filing to all counsel registered electronically.  I hereby certify that a copy of this paper was mailed to the following non-registered ECF participants on June 29, 2007. **None.**

s/Michael E. Lang
Deputy Clerk to
Magistrate Judge Donald A. Scheer
(313) 234-5217